UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LESLY JEAN-PHILIPPE,

Petitioner,

v. Case No. 3:20-cv-789-MMH-LLL

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, et al.,

Respondents.

---

**ORDER**

**I. Status**

Petitioner Lesly Jean-Philippe, an inmate of the Florida penal system, initiated this action by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1).[1] He proceeds on a Second Amended Petition (Doc. 7) with exhibits (Docs. 7-1 through 7-2). In the Second Amended Petition, Jean-Philippe challenges a 2011 state court (Duval County, Florida) judgment of conviction for first-degree murder and aggravated battery with a deadly

[1] For all pleadings and exhibits filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

weapon. He raises four grounds for relief.[2] See Second Amended Petition at 8-29. Respondents submitted a Response to the Second Amended Petition (Response; Doc. 17). They also submitted exhibits. See Docs. 17-1 through 17-29; Docs. 9-1 through 9-10. Jean-Philippe filed a brief in reply (Reply; Doc. 21). This action is ripe for review.

## II. Relevant Procedural History

On January 7, 2010, a grand jury returned an indictment charging Jean-Philippe with the first-degree murder of his wife, Elkie Jean-Philippe (Elkie) (Count 1), armed burglary (Count 2), and aggravated battery with a deadly weapon on his sister-in-law, Roya Gordon (Gordon) (Count 3). See Doc. 17-2. On Jean-Philippe's motion, and with the agreement of the State, the court dismissed the armed burglary charge. See Doc. 17-5 at 5-6. On March 10, 2011, a jury convicted Jean-Philippe of first-degree murder as charged in Count 1 and aggravated battery with a deadly weapon as charged in Count 3. See Doc. 17-12; Doc. 17-20 at 8-10. Following the jury's unanimous recommendation, the court sentenced Jean-Philippe to death for the first-degree murder conviction and fifteen years imprisonment for the aggravated battery

[2] Although Jean-Philippe enumerates three grounds for relief in the Second Amended Petition, he also raises an actual innocence claim. See Second Amended Petition at 16, 23, 29.

conviction. Doc. 17-12 at 3-4. On direct appeal to the Florida Supreme Court, Jean-Philippe raised five claims:

> (1) whether the trial court erred in admitting evidence of text messages sent from [Jean-Philippe's] cell phone to his sister-in-law and to his wife; (2) whether the trial court erred in finding that the murder was CCP [cold, calculated, and premeditated]; (3) whether the trial court erred in giving great weight to the finding that the murder was HAC [heinous, atrocious, or cruel]; (4) whether the sentence of death is proportionate; and (5) whether Florida's capital sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed.2d 556 (2002).

Jean-Philippe v. State, 123 So. 3d 1071, 1077-78 (Fla. 2013). On June 13, 2013, the Florida Supreme Court affirmed Jean-Philippe's convictions and sentences, id., and on October 24, 2013, issued the mandate. See Lesly Jean-Philippe v. State, No. SC11-1274, Mandate (Fla. Oct. 24, 2013).[3]

In 2015, Jean-Philippe, through counsel, filed a fourth amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. See Doc. 17-16. (Rule 3.851 Motion). In his Rule 3.851 Motion, filed November 30, 2015, Jean-Philippe argued that his trial counsel were ineffective when they failed to: (1) object to the State's allegedly incorrect recitation of law during the penalty phase; (2) investigate Jean-Philippe and Elkie's marital issues; (3)

[3] The Court takes judicial notice of Jean-Philippe's state court dockets. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

request DNA testing on certain evidence found at the scene; (4) hire an expert witness to rebut the State's theory that Jean-Philippe's injuries were self-inflicted; (5) hire an expert pathologist to rebut the medical examiner's testimony; (6) hire an expert crime scene analyst to rebut the testimony of certain State witnesses; (7) challenge the State's assertion that a tire jack constituted a deadly weapon for purposes of the aggravated battery charge; (8) object to the State's theory of the case; (9) object to the admission of hearsay statements; (10) argue self-defense or present any other theory of defense; (11) properly advise Jean-Philippe regarding his right to testify in his own defense; (12) seek a mental health evaluation of Jean-Philippe during the penalty phase; (13) properly investigate and present mitigation witnesses during the penalty phase; (14) hire an expert on Haitian culture to testify during the penalty phase; (15) present Jean-Philippe's mental health history as mitigation evidence during the penalty phase; (16) consult an independent forensic expert to rebut the State's proffered evidence related to certain aggravating factors during the penalty phase; (17) seek a mistrial during the penalty phase; and (18) present an adequate penalty phase closing argument. See id. at 1-56. In addition to the ineffective assistance of counsel arguments in his Rule 3.851 Motion, Jean-Philippe argued that (1) the State committed a

Brady[4] violation; (2) the State presented inadmissible evidence and testimony during the guilt phase; (3) there was cumulative error; and (4) he may be incompetent by the time of execution. Id. at 56-65.

While his Rule 3.851 Motion was pending, Jean-Philippe, through counsel, filed a motion to vacate his death sentence pursuant to Hurst v. Florida, 577 U.S. 92 (2016). See Doc. 17-28. The circuit court denied the motion on December 5, 2016.[5] See Doc. 17-29. But, on November 9, 2017, the parties entered into a stipulated agreement that Jean-Philippe would waive all claims concerning the guilt phase of his trial raised in his Rule 3.851 Motion, and would be resentenced to life in prison.[6] See Doc. 17-17 at 2; Doc. 17-19 at 46.

---

[4] Brady v. Maryland, 373 U.S. 83 (1963).

[5] In denying the motion, the court stated: "Since the filing of the instant [m]otion, the Florida Supreme Court released two opinions: Hurst v. State, 41 Fla. L. Weekly S433 (Fla. Oct. 14, 2016) and Perry v. State, 41 Fla. L. Weekly S449 (Fla. Oct. 14, 2016). In Hurst v. State, the Florida Supreme Court specifically ruled that the United States Supreme Court's decision in Hurst v. Florida did not trigger the provision of section 775.082(2). While not conceding, [Jean-Philippe] recognized these opinions were controlling." See Doc. 17-29 at 1 (emphasis removed).

[6] The terms of the stipulated agreement were as follows:

> 1. The State concedes resentencing pursuant to Hurst v. Florida.
> 2. [Jean-Philippe] agrees to waive all grounds asserted for a new guilt phase in his pending Motion for Post-Conviction Relief filed pursuant to Rule 3.851, Florida Rules of Criminal Procedure.
> 3. In consideration of [Jean-Philippe's] waiver, the State of Florida will file a Notice withdrawing its Notice of Intent to Seek the Death Penalty.
> 4. It is agreed and stipulated that the original sentence as to Count 1 will be vacated and [Jean-Philippe] will be re-sentenced to life in prison without the possibility of parole as to Count 1 of the Indictment.

The court accepted the stipulated agreement after conducting a colloquy with Jean-Philippe and resentenced Jean-Philippe to a term of life in prison for the first-degree murder conviction in Count 1. See Doc. 17-18; Doc. 17-20 at 20-24.

On November 1, 2018, Jean-Philippe filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. See Doc. 9-4 (Rule 3.850 Motion). In the Rule 3.850 Motion, Jean-Philippe argued his trial counsel were ineffective when they (1) failed to seek suppression of text messages obtained in a warrantless search, (2) failed to object to the admission of the text messages on double-hearsay grounds, and (3) interfered with his right to testify and failed to prepare and present a viable defense. Id. In addition, Jean-Philippe argued his postconviction counsel was ineffective when she misadvised him about waiving his postconviction rights and when she failed to notify the court that she was not certified under Florida Rule of Criminal Procedure 3.112(f). Id. The state court denied relief. See Doc. 17-20 at 1-6.

The First District Court of Appeal (First DCA) per curiam affirmed the state court's denial of the Rule 3.850 Motion on March 31, 2020, and issued the mandate on April 28, 2020. Doc. 17-27. Jean-Philippe filed a pro se motion for rehearing, which the First DCA struck as unauthorized on May 7, 2020. See

See Doc. 17-19 at 46.

Doc. 9-6 at 16. Jean-Philippe filed the instant action under 28 U.S.C. § 2254 on June 8, 2020.[7] See Doc. 1; Doc. 16.

## III. One-Year Limitations Period

The Court previously determined that this action was timely filed within the one-year limitations period set forth in 28 U.S.C. § 2244. See Doc. 16.

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Jean-Philippe's] claim[s]

[7] See Houston v. Lack, 487 U.S. 266, 276 (1988) (mailbox rule).

without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'" Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is

unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a

> "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.
>
> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster,

563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

**B. Exhaustion/Procedural Default**

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including

> constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[8] supra, at 747-748, 111 S. Ct. 2546; Sykes,[9] supra, at 84-85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127-1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617-18, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992)

[8] Coleman v. Thompson, 501 U.S. 722 (1991).

[9] Wainwright v. Sykes, 433 U.S. 72 (1977).

> (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[10] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir.

[10] Murray v. Carrier, 477 U.S. 478 (1986).

2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

**C. Ineffective Assistance of Trial Counsel**

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (first citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); and then Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for

> counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly

> deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at ---, 131 S. Ct. at 788.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014); Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference — this one to a state court's decision — when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As Ground One, Jean-Philippe argues his trial counsel were ineffective when they failed to seek suppression of text messages obtained from his cell phone through a warrantless search. See Second Amended Petition at 8-16. Jean-Philippe raised a substantially similar claim as ground one in his Rule

3.850 Motion. See Doc. 9-4 at 9-18. The postconviction court found the claim untimely, stating in pertinent part:

> Where a court "grants relief to a defendant which ultimately results in an amended judgment being entered, as to any new issues raised by entry of the amended judgment, the time period for filing a rule 3.850 motion begins to run at the time of the amended judgment." Rogers v. State, 25 So. 3d 636[] (Fla. 1st DCA 2009). However, generally the two-year time limit contained in Rule 3.850 []is not tolled by other collateral proceedings filed in the trial court, even if a corrected sentence is entered. Marrero v. State, 967 So. 2d 934, 936 (Fla. 2d DCA 2007) (citing Joseph v. State, 835 So. 2d 1221, 1222 n.3 (Fla. 5th DCA 2003); Sireci v. State, 773 So. 2d 34, 44 (Fla. 2000) (holding that guilt phase claims were time barred since defendant[']s convictions became final over two years prior even though [d]efendant was later resentenced).
>
> Accordingly, because the first two grounds allege ineffective assistance of counsel for guilt phase claims relating to his conviction, these claims are untimely and will not be addressed.

Doc. 17-20 at 2-3. The First DCA affirmed without a written opinion. See Doc. 17-27.

Respondents argue that the postconviction court relied on an independent and adequate state procedural ground when it found the claim untimely, and therefore, Jean-Philippe is procedurally barred from federal habeas relief. Response at 25-32. Alternatively, Respondents contend that the claim lacks merit even if it is not procedurally barred. Id. at 32-34. Jean-Philippe disagrees, arguing that Ground One is meritorious, not procedurally

barred, and that even if it were barred, the exceptions to procedural default apply to the claim. See Reply at 1-7.

The Eleventh Circuit has established a three-part test to determine when a state court's procedural ruling relies on an independent and adequate state ground. Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). "First, (1) the last state court rendering judgment must clearly and expressly state it is relying on a state procedural rule to resolve the federal claim. . . . Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. . . . Third, the state procedural rule must be adequate." Id. (citations omitted and emphasis added).

As applied here, the postconviction court's untimeliness finding was based on the procedural requirements of Rule 3.850, which is an independent and adequate state procedural ground. See LeCroy v. Sec'y, Fla. Dep't of Corr., 421 F.3d 1237, 1260 n.25 (11th Cir. 2005) ("[T]he procedural requirements of Florida's Rule 3.850 constitute independent and adequate grounds under the applicable law."); Kimbrough v. Sec'y, Fla. Dep't of Corr., 809 F. App'x 684, 692-93 (11th Cir. 2020) (holding the denial of a claim as untimely under Rule 3.850(b) "rested on an independent and adequate state procedural ground").[11]

---

[11] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a

Second, the postconviction court's untimeliness determination rested solely on state procedural grounds without citing to or otherwise referencing federal law. Thus, the postconviction court's "ruling was not intertwined with federal law." Kimbrough, 809 F. App'x at 692.

Third, the procedural rule was adequate to support the postconviction court's untimeliness finding. See id. That is, the postconviction court properly applied a regularly followed procedural default principle to find Jean-Philippe's claim untimely. A Rule 3.850 motion for postconviction relief must be filed within two years of the criminal judgment "unless the motion alleges that the facts on which the claims for relief are predicated could not have been discovered earlier by the exercise of due diligence." See Kimbrough, 809 F. App'x at 692 (citing Fla. R. Crim. P. 3.850(b)(1)). "The two-year limitation is not tolled by other collateral proceedings filed in the trial court, even if a corrected sentence is entered." Joseph v. State, 835 So. 2d 1221, 1222 n.3 (Fla. 5th DCA 2003); Gillis v. State, 32 So. 3d 681, 682 (Fla. 2d DCA 2010) (finding that defendant's resentencing, which occurred after direct review proceedings concluded, did not toll two-year time limit for filing Rule 3.850 motion); Zeigler v. State, 632 So.2d 48, 50 (Fla. 1993) (although defendant's death penalty

particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

sentence was vacated in 1988, the two-year period for his Rule 3.850 motion raising guilt phase claims expired on January 1, 1987, because the information upon which the claims were based was ascertainable prior to the finality date of the judgment and sentence). Here, the postconviction court determined that the two ineffective assistance of trial counsel grounds in Jean-Philippe's Rule 3.850 Motion related to the guilt phase of his 2011 convictions, and as such, were untimely. Therefore, relief on those claims – which Jean-Philippe now raises as Grounds One and Two in his Second Amended Petition – is procedurally barred for purposes of federal habeas review.

In an effort to avoid the bar, Jean-Philippe cites Martinez and argues that his trial counsel and postconviction counsel's ineffective assistance constitutes cause and actual prejudice. See Second Amended Petition at 13-15; Reply at 1-2. Jean-Philippe also argues that he is entitled to the benefit of the fundamental miscarriage of justice exception. See Second Amended Petition at 15-16. But, even if Ground One is not procedurally barred, it is without merit. Assuming arguendo that trial counsel's failure to seek suppression of the text messages constituted deficient performance, Jean-Philippe has not shown that a reasonable probability exists the outcome of his trial would have been different if the text messages had been suppressed.

In Florida, premeditated first-degree murder is defined as "[t]he unlawful killing of a human being[] when perpetrated from a premeditated

design to effect the death of the person killed or any human being." § 782.04(1)(a), Fla. Stat. "Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Asay v. State, 580 So. 2d 610, 612 (Fla. 1991). "Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Jones v. State, 321 So. 3d 790, 801 (Fla. 4th DCA 2021) (quoting Larry v. State, 104 So. 2d 352, 354 (Fla. 1958)).

At trial, the State presented evidence that Jean-Philippe and Elkie were experiencing issues in their marriage and that Elkie wanted a divorce. Doc. 17-6 at 34, 39-40; Doc. 17-8 at 70-73. Approximately one week before the murder, Jean-Philippe flew to Rhode Island to visit his family. Doc. 17-6 at 42-43. On the day of the murder, August 26, 2009, Gordon flew to Jacksonville to visit Elkie. Doc. 17-6 at 41. Jean-Philippe also flew back to Jacksonville that day. See Doc. 17-7 at 56-57. Gordon testified that Jean-Philippe was aware of her travel plans, but neither she nor Elkie were aware that Jean-Philippe was back in Jacksonville. Doc. 17-6 at 43-47, 101, 107. Jean-Philippe's cell phone call logs, which were admitted at trial, showed

> repeated calls from [Jean-Philippe's] phone to the sisters' phones on the day of the murder, including more than sixty calls to Elkie's alone. In addition, these call records showed that as [Jean-Philippe] traveled from Rhode Island to Jacksonville on the day of the murder, his phone did too. The records reflected that the phone's servicing areas changed from Rhode Island to Washington, D.C., and finally to Jacksonville. Moreover, Gordon's testimony corroborated this evidence. She testified that she and [Jean-Philippe] communicated through their cell phones during the period that he was in Rhode Island and particularly on the day of the murder. On August 26, they used their cell phones to speak to each other by phone, to leave recorded messages, and to send and receive text messages. For example, Gordon told the jury that soon after she arrived in Jacksonville, she spoke to [Jean-Philippe] when he called and that after Elkie picked her up, [Jean-Philippe] called both of their phones repeatedly.

See Jean-Philippe, 123 So.3d at 1078. A taxicab driver testified that he picked up Jean-Philippe at the airport and drove him to Elkie's apartment complex. See Doc. 17-8 at 11-20. When Jean-Philippe reached the apartment, he knocked on the door and pretended to be a pizza delivery person. Doc. 17-6 at 48-51. Because the sisters had not ordered any pizza, Elkie asked Gordon to accompany her to the door. Id. Elkie opened the door, at which point Jean-Philippe barged inside and hit Gordon on the head with a tire jack. Id. at 50-51. Gordon fled to the back of the apartment. Id. at 51. Gordon testified that she heard Elkie screaming and pleading with Jean-Philippe, id. at 52, and that when Gordon fled the apartment minutes later to call 911, she saw Elkie lying

on the floor in the kitchen and Jean-Philippe standing over her with his arms raised in the air, id. at 55-57. When law enforcement officers arrived and entered the apartment, they found Elkie lying on the kitchen floor and bleeding profusely from numerous stab wounds. Doc. 17-6 at 164-65, 198; Doc. 17-7 at 10-12. Officers also found Jean-Philippe lying on the floor unconscious and bleeding, with two knives near his hands. Doc. 17-6 at 166-67, 170. Elkie passed away shortly after she was transported by ambulance to the hospital. Doc. 17-8 at 155-56. The forensic pathologist who performed Elkie's autopsy testified at trial that

> [Elkie] was in shock and ultimately bled to death as a result of the numerous stab wounds. Specifically, she had fifty-two or fifty-three stab wounds and suffered injuries to her ear, lip, head, neck, nose, arms, fingers, shoulder, back, chest, breast, and abdomen. The pathologist testified that each of seven or eight of the stab wounds alone could have been fatal. This included penetrating wounds to the victim's lung, liver, and stomach. In addition, the victim had defensive wounds to her arms and hands and had suffered several blunt force injuries. Because of the nature of the victim's wounds, death was not instantaneous. She felt pain, was conscious, and could still talk, move, and fight her attacker throughout the assault.

See Jean-Philippe, 123 So.3d at 1076; see also Doc. 17-8 at 155-86.

Even without the text messages, the foregoing evidence was sufficient to support the jury's verdict.[12] Thus, even assuming Jean-Philippe's trial counsel performed deficiently by not seeking suppression of the text messages, Jean-Philippe has failed to establish prejudice. He has not shown that a reasonable probability exists that the outcome would have been different if the text messages had been suppressed. Accordingly, relief on the claim in Ground One is due to be denied.

---

[12] Notably, the Florida Supreme Court also determined there was substantial evidence to support the jury's first-degree murder verdict without considering Jean-Philippe's text messages or call logs:

> [Jean-Philippe] was indicted for the first-degree, premeditated murder of his wife. "Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Asay v. State, 580 So.2d 610, 612 (Fla. 1991). The evidence shows that on the day of the murder, [Jean-Philippe] flew to Jacksonville, waited outside his marital home for his wife to return, obtained a weapon, and employed a ruse to gain entry into the apartment. He then beat and repeatedly stabbed his wife, injuring her head, lung, breast, back, arms, and other parts of her body over an extended period of time as she screamed and pleaded for help. See Miller v. State, 42 So.3d 204, 228 (Fla. 2010) (noting the location of wounds and force used in stabbings constituted competent, substantial evidence supporting premeditation), cert. denied, —— U.S. ——, 131 S.Ct. 935, 178 L.Ed.2d 776 (2011). In light of this evidence, we hold that competent, substantial evidence supports the jury's finding of first-degree murder beyond a reasonable doubt.

Jean-Philippe, 123 So. 3d at 1084.

**B. Ground Two**

As Ground Two, Jean-Philippe argues his trial counsel were ineffective when they: (A) interfered with his right to testify and (B) failed to prepare and present a defense. See Second Amended Petition at 17-22. Jean-Philippe raised a substantially similar claim as ground two in his Rule 3.850 Motion. See Doc. 9-4 at 19-24. The postconviction court rejected this claim as untimely for the same reasons stated in Ground One. See Doc. 17-20 at 2-3. The First DCA affirmed without a written opinion. See Doc. 17-27.

For the reasons previously discussed, relief on the claims in Ground Two is procedurally barred for purposes of federal habeas review. Even assuming the claims in Ground Two are not procedurally barred, Jean-Philippe is not entitled to relief.

As to Subclaim A, "[a] criminal defendant has a fundamental constitutional right to choose whether to testify in his own defense." United States v. Anderson, 1 F.4th 1244, 1253 (11th Cir. 2021). That right is personal and fundamental, meaning neither the court nor counsel can waive it. United States v. Teague, 953 F.2d 1525, 1532 (1992). Counsel gives ineffective assistance with respect to a defendant's right to testify where counsel "has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." Gallego

v. United States, 174 F.3d 1196, 1197 (11th Cir. 1999). "Where the defendant claims a violation of his right to testify by defense counsel, the essence of the claim is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf." Teague, 953 F.2d at 1534. Importantly, however, an attorney is not deficient for strategically advising a defendant not to take the stand. Id. at 1533 ("[I]f defense counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify.").

The record reflects that at the close of the State's case in chief, the trial court engaged in a lengthy colloquy with Jean-Philippe to ensure that he was voluntarily choosing not to testify:

> THE COURT: And, Mr. Jean-Philippe, you have heard your lawyer indicate, first, that you do not wish to call – you're not going to call any witnesses on your own behalf; is that right?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Have you had adequate time to discuss that decision with your counsel?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And do you agree with her decision in that regard?
>
> THE DEFENDANT: Yes, sir.

THE COURT: Included in that statement is the understanding you are not going to testify in your own behalf; is that true?

THE DEFENDANT: Yes, sir.

THE COURT: And while you have three very good lawyers, who I'm sure have discussed thoroughly with you your constitutional rights in that regard, I want to talk about that with you for a moment.

You have the absolute constitutional right not to testify. I will instruct the jury that they are not permitted to infer your guilt from your exercise of your right to remain silent and they are not to even be influenced in any way by your decision not to testify. While you have the absolute . . . constitutional right not to testify, you also have the absolute constitutional right to testify. Whether or not to testify is a decision that you, and you alone, can make. Your friends and family members cannot make that decision for you. Your lawyers cannot make that decision for you. Only you can make that decision.

I encourage you to consider carefully the sage advice of your lawyers, but, ultimately the decision of whether or not to testify rests with you. Understanding what I have explained to you, do you still wish not to testify in this case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: During the course of this trial, have you had adequate opportunity to discuss decisions related to witnesses and jury selection, things of that sort? Have you had adequate time to discuss all of those matters with your lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: And, as it pertains to jury selection and the calling witnesses, you agree with your lawyers' decisions in that regard? Is that a true statement?

THE DEFENDANT: Yes, Your Honor.

See Doc. 17-9 at 70-72.

"It is apparent from th[is] colloquy that [Jean-Philippe's] counsel did not prevent [him] from testifying or otherwise interfere with his right to take the stand." Ruiz v. Sec'y, Dep't of Corr., No. 8:06-cv-2086-EAK-TGW, 2008 WL 786327, at *4 (M.D. Fla. Mar. 20, 2008). To the contrary, Jean-Philippe "was well aware of his right to testify and voluntarily chose not to do so." Id.; see also Ho v. Sec'y, Dep't of Corr., No. 20-cv-80010, 2020 WL 7890670, at *13 (S.D. Fla. Nov. 5, 2020) (finding that, because the trial court "court conducted a thorough colloquy with [p]etitioner," his "decision not to testify was voluntary and knowingly made, without any deficiency on counsel's part").[13] Because the ultimate decision not to testify rested with Jean-Philippe, not his counsel, the Court finds that he has not shown deficient performance by his trial counsel as to this issue. Therefore, relief on Subclaim A is due to be denied.

As to Subclaim B, the record shows that after the State rested its case, the trial court conducted the above colloquy regarding Jean-Philippe's decision not to testify or call any witnesses on his behalf. See Doc. 17-9 at 70-72. Jean-

[13] The Court notes that although decisions of other district courts are not binding, they too may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Philippe's trial counsel then moved for judgment of acquittal, which the court denied. Id. at 73. In Subclaim B, Jean-Philippe argues that his trial counsel were ineffective for failing to present a "self-defense theory of defense and/or heat of passion/hot blood defense" or any other viable defense that would support a verdict for a lesser-included offense. See Second Amended Petition at 17.

Trial attorneys should investigate "plausible lines of defense," Fortenberry v. Haley, 297 F.3d 1213, 1226 (11th Cir. 2002), but this duty does not require counsel to "investigate substantially all plausible lines of defense." Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994). Indeed, the test for ineffectiveness is neither whether counsel could have done more nor whether the best criminal defense attorneys might have done more; in retrospect, one may always identify shortcomings. Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (stating that "perfection is not the standard of effective assistance") (quotations omitted). Instead, the test is whether what counsel did was within the wide range of reasonable professional assistance. Ward, 592 F.3d at 1164 (quotations and citation omitted); Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) ("The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what 'most good lawyers' would have done.") (citation omitted). Here, based on the record, Jean-Philippe has failed to carry

his burden of showing that his trial counsel's representation fell outside that range of reasonably professional assistance. Indeed, given the State's evidence and having agreed with the decision not to call any witnesses at all, Jean-Philippe fails to suggest how counsel could have presented a "self defense" or "heat of passion/hot blood" defense. Thus, relief on Subclaim B is due to be denied.

**C. Ground Three**

As Ground Three, Jean-Philippe argues that his postconviction and resentencing counsel was ineffective because she lacked postconviction experience and misadvised him about his ability to seek future postconviction relief. See Second Amended Petition at 23-29.

Jean-Philippe raised a substantially similar claim as ground three of his Rule 3.850 Motion. See Doc. 9-4 at 29-34. The postconviction court denied relief, stating in pertinent part:

> Initially, this Court notes that "[i]neffective assistance of postconviction counsel is not a cognizable claim in Florida." Netting v. State, 129 So. 3d 429, 432 (Fla. 2013) (citing Kokal v. State, 901 So. 2d 766, 778 (Fla. 2005)). This Court also finds the State withdrew their notice of intention to seek the death penalty prior to the resentencing hearing. (Ex. F.) Accordingly, the resentencing was not a capital proceeding in which counsel must meet such requirements. Additionally, when this Court appointed counsel, it specifically stated that she was "qualified counsel from the Statewide Attorney Registry provided by the Commission on Capital Cases having been found who

has agreed to represent the Defendant . . ." (Ex. G.) Lastly, as the resentencing was a part of an agreement, there is no reasonable probability the result of the proceeding would have been different with a different attorney.

Also within this Ground, Defendant states the Stipulation and Waiver Defendant signed waiving his guilt phase claims was unintelligent and involuntary because he was misadvised by counsel. Defendant suggests counsel misadvised him by instructing him to execute the form without informing him of the consequences thereof and that he was waiving "critical postconviction claims." (Def.'s Mot. at 33-34.)

At the time Defendant entered this stipulation, this Court conducted a colloquy with Defendant to ensure he understood the consequences of this agreement. (Ex. H.) In that colloquy, Defendant assured this Court that he had enough time to speak to both of his attorneys and discussed "all of the facts of this case that [they] believe to be important to any potential resentencing hearing." (Ex. H at 7.) He further affirmed the lawyers answered all questions he asked regards to the preparation of an evidentiary hearing on his postconviction motion. (Ex. H at 7-8.) Defendant assured this Court that his attorneys had not failed to investigate anything in this case. (Ex. H at 8.) Ultimately, Defendant insisted he had no []reservation whatsoever to even the smallest degree as it pertains to the efficacy and the skilled representation [counsel had] provided [him] during the course of this matter. (Ex. H at 8.) The Court went through each paragraph of the agreement to ensure Defendant understood the entirety of the agreement. (Ex. H at 9-10.) Defendant understood this agreement meant he would have abandoned any claim that he previously raised, alleging entitled him to a new trial and guilt phase, and waiving all guilt phase issues for a new sentence. (Ex. H at 9-10.) Accordingly, this Court finds the record refutes Defendant's current allegations and, as such, this claim may be denied. Russ v. State, 937 So. 2d 1199, 1201 (Fla. 1st DCA

> 2006) ("[W]here an appellant makes a clearly and wholly inconsistent affirmance which contradicts his later postconviction claim, such claim may be summarily denied."). Defendant is, therefore, not entitled to relief.

Doc. 17-20 at 3-5. The First DCA affirmed the denial of relief without a written opinion. See Doc. 17-27.

To the extent that the First DCA decided this claim on the merits,[14] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Jean-Philippe is not entitled to relief on the basis of this claim.

Nevertheless, even if the state appellate court's adjudication of this claim is not entitled to deference, the claim is without merit. Under Florida law, first-degree murder is a capital felony punishable by either death or life in prison without parole. §§ 775.082(1)(a) and 782.04(1)(a), Fla. Stat. After the State

[14] In looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." Wilson, 138 S. Ct. at 1194.

withdrew its notice of intent to seek the death penalty based on the agreement reached between the parties during the Rule 3.851 postconviction proceeding, the court resentenced Jean-Philippe to the only other possible sentence under Florida law for first-degree murder—life in prison without the possibility of parole. Thus, even assuming postconviction counsel performed deficiently by virtue of her qualifications, or lack thereof, Jean-Philippe has not shown prejudice as there is no reasonable probability that the result of his resentencing would have been different had he been appointed a different attorney.

Further, the record does not support Jean-Philippe's contention that his postconviction counsel misadvised him regarding the effect of the stipulated agreement. During the lengthy colloquy regarding the agreement, the postconviction court questioned Jean-Philippe regarding the terms of the agreement:

> THE COURT: The stipulation and waiver, and I'm going to read it with you, the stipulation and waiver, number one says, the State concedes resentencing pursuant to Hurst [v.] Florida, which means . . . there is an agreement between both yourself and the State of Florida that a resentencing hearing is appropriate in this case, do you understand that?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Are you in agreement with that?
>
> THE DEFENDANT: Yes, Your Honor.

THE COURT: Paragraph number two says the defendant, which of course that's you, the defendant agrees to waive all grounds asserted for a new guilt phase in his pending motion for post-conviction relief filed pursuant to rule 3.851 Florida Rules of Criminal Procedure. Do you understand what that paragraph means?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And tell me in your own words what you understand that paragraph to mean.

THE DEFENDANT: That I am withdrawing my 3.851 and all the guilt phase issues that pertain to my 3.851 and in exchange for this new sentence.

THE COURT: All right. And you understand that as a result of this agreement if it's accepted by the Court, that as a result of this agreement you would . . . be considered to have abandoned any claim that you have previously raised that you contended at that time entitles you to a new trial on guilt as well as the penalty phase, is that what you want to do?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You have any questions of me as to legal ramifications of that?

THE DEFENDANT: No, Your Honor.

THE COURT: And you understand, of course, as a result that the jury's previous verdict of guilty in this case will remain undisturbed and you will be adjudicated – will remain adjudicated, I should say, guilty of First Degree Premeditated Murder as well as the aggravated battery, you understand that?

THE DEFENDANT: Yes, Your Honor.

Doc. 17-20 at 36-39. This colloquy unequivocally demonstrates that Jean-Philippe knowingly and voluntarily entered into the agreement with an understanding of the consequences of the agreement. Additionally, during the colloquy, Jean-Philippe affirmatively indicated that (1) he had spoken with his postconviction counsel regarding the agreement, (2) his postconviction counsel answered all of his questions, (3) he had no reservations regarding his counsel's performance during the course of postconviction proceedings, and (4) no one coerced, threatened, or made any promises to him in order to get him to sign the agreement. Id. at 34-35. On this record, Jean-Philippe has not shown deficient performance by his postconviction counsel. Thus, relief on the claim in Ground Three is due to be denied.

**D. Ground Four**

In Grounds One and Two of his Second Amended Petition, Jean-Philippe also appears to raise a freestanding claim that he is "actually and factually innocent" of first-degree premeditated murder. See Second Amended Petition at 16, 23, 29.

Assuming this claim was properly exhausted and not procedurally barred, Jean-Philippe is not entitled to relief. It is not apparent whether a freestanding actual innocence claim is cognizable in a capital case on federal habeas review. Johnson v. Warden, Ga. Diagnostic & Classification Prison, 805

F.3d 1317, 1324 (11th Cir. 2015) (citing Herrera v. Collins, 506 U.S. 390, 417 (1993); In re Davis, 565 F.3d 810, 816 (2009); Jordan v. Sec'y Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007)). However, assuming arguendo such a claim is cognizable, the Eleventh Circuit has stated:

> The Supreme Court in Herrera[15] assumed, but did not hold, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417, 113 S.Ct. 853. But the Court made clear that the required "truly persuasive demonstration" should, and would, be very difficult to make. Id. It acknowledged the "very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States." Id. That is why the Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." Id. (emphasis added).

In re Dailey, 949 F.3d 553, 560 (11th Cir. 2020). Based on a review of the record and the pleadings, the Court finds Jean-Philippe has wholly failed to make the requisite showing. Accordingly, insofar as Jean-Philippe raises an actual innocence claim, he is not entitled to federal habeas relief.

[15] Herrera v. Collins, 506 U.S. 390 (1993).

## VII. Certificate of Appealability Pursuant to 28 U.S.C. § 2253(c)(1)

If Jean-Philippe seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Jean-Philippe "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon

consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1. The Second Amended Petition (Doc. 7) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2. The Clerk of the Court shall enter judgment denying the Second Amended Petition and dismissing this case with prejudice.

3. If Jean-Philippe appeals the denial of the Second Amended Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4. The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of January, 2024.

Marcia Morales Howard

MARCIA MORALES HOWARD
United States District Judge

Jax-10 12/22
C: Lesly Jean-Philippe, #J44119
Counsel of record